**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TIMOTHY JONES, ) | |
| ) | No. 09 C 03916 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| DR. STEPHEN CULLINAN and ) | |
| DR. PARTHA GHOSH,[1] ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Timothy Jones filed this suit against Defendants Dr. Stephen Cullinan and Dr. Partha Ghosh, alleging that the doctors violated his Eighth Amendment rights while he was a prisoner in the Illinois Department of Corrections (IDOC).[2] 42 U.S.C. § 1983. Specifically, Jones alleges that Cullinan and Ghosh acted with deliberate indifference to his serious medical needs while treating his non-Hodgkin's mantle cell lymphoma in violation of the Eighth Amendment's prohibition against cruel and unusual punishment (as incorporated against state officers via the Fourteenth Amendment). Defendants now move for summary judgment. [R. 82] For the reasons set forth below, summary judgment is granted in part and denied in part as to the claim against Cullinan, and granted as to the claim against Ghosh.

---

[1]In addition to Drs. Cullinan and Ghosh, Plaintiff originally named Dr. Adrian Feinerman, Dr. Seth Osafo, Wexford Health Sources, Inc., and Health Professionals, Ltd. as defendants to this lawsuit, but those defendants were subsequently dismissed. *See* R. 63. Citations to the docket are indicated by "R." followed by the docket entry.

[2]This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## I. Background

In deciding Defendants' summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, Jones. Timothy Jones was previously an inmate within the Illinois Department of Corrections. R. 83, Defs.' Stmt. of Uncontested Facts (DSOF) ¶ 1. Jones was first diagnosed with non-Hodgkin's mantle cell lymphoma while incarcerated at Pinckneyville Correctional Center. *Id.* ¶8. Non-Hodgkin's mantle cell lymphoma is generally considered an incurable form of lymphoma. *Id.* ¶ 9. In late 2005, Jones was transferred to Illinois River Correctional Center to receive cancer treatment from Dr. Stephen Cullinan in Pekin, Illinois. R. 83-1, Def.'s Exh. A (Pl.'s Am. Compl.) ¶ 24. Cullinan is a board-certified oncologist who works at Oncology Hematology Associates of Central Illinois. DSOF ¶ 2. He also serves as a regional medical director for Health Professionals Limited, a company that provides, under a contract with the State, health care services to the entire IDOC system. R. 89, Pl.'s Stmt. of Uncontested Facts (PSOF) ¶ 2. Although the parties do not dispute that Cullinan treated Jones at the Oncology Hematology Associates' facility in Pekin, Illinois, DSOF ¶ 2, PSOF ¶ 2, they do dispute whether Cullinan acted purely in his capacity as a private physician. *See* R. 88, Pl.'s Resp. Br. at 8-10.

Cullinan first saw Jones in September 2005 and recommended a chemotherapy regimen called R-CHOP, which involves the administration of five different drugs. DSOF ¶¶ 10-11. R-CHOP therapy is a standard regimen used for treating aggressive and intermediate forms of lymphoma in the United States, though it is not the only regimen available. *Id.* ¶ 12; PSOF ¶ 12. A patient undergoing R-CHOP therapy

typically receives six cycles of the drugs. DSOF ¶ 13. Jones received his first treatment in September 2005, and completed his sixth treatment by January of the following year. *Id.* ¶¶ 14, 15. On January 9, 2006, Cullinan informed Dr. Seth Osafo, Jones's attending physician at Illinois River Correctional Center, that Jones had completed his final round of R-CHOP treatment and recommended some additional studies to see how well Jones responded to the treatment. *Id.* ¶ 15. Osafo performed these tests, PSOF ¶ 15, and upon reviewing the results in February 2006, Cullinan concluded that Jones's cancer had been treated into remission. DSOF ¶ 18; R. 89-5, Pl.'s Exh. 4. Cullinan recommended that the tests be repeated three months' time. Pl.'s Exh. 4. However, Cullinan expressed concern about some possible residual adenopathy in Jones's left armpit area, and wrote to Osafo that "I am wondering if that is biopsiable." DSOF ¶ 19; Pl.'s Exh. 4. Cullinan intended this statement to be a request that Osafo perform a biopsy on the area, if possible. R. 83-2, Cullinan Dep. 85:7-85:11, 88:8-88:14. But Osafo did not interpret this statement as a direct request; rather, he thought Cullinan was merely wondering to himself whether the area was biopsiable. R. 89, Pl.'s Stmt. of Add'l Facts (PSAF) ¶ 1; R. 89-2, Osafo Dep. 113:10-114:3. Osafo never performed a biopsy on the possible residual adenopathy in Jones's left armpit area. PSAF ¶ 2.

In the interim, Jones continued to show signs of progress. As of July 2006, there were no significant problems indicated in Jones's most recent laboratory studies, DSOF ¶ 20; R. 83-6, Def.'s Exh. F, and Cullinan noted that there was "[n]o other treatment indicated by me at this juncture." DSOF ¶ 21; R. 83-7, Def.'s Exh. G.

3

Then, in March 2007, another set of studies revealed a possible enlarged lymph node in Jones's chest region. DSOF ¶ 22. Although the radiologist who conducted the study suggested further inquiry into the possible adenopathy, *see* R. 89-7, Pl.'s Exh. 6, Cullinan chose not to request a CT scan and recommended that the studies be repeated again in three months. DSOF ¶ 22. Per Cullinan's recommendation, another set of x-rays were taken in June. PSAF ¶ 4. Upon reviewing the June 2007 x-rays, Dr. Richard Shute, a visiting doctor filling in for Osafo at Illinois River Correctional Center, noticed a problem and immediately ordered a new CT scan. PSAF ¶ 5. The results of the scan revealed that there was, in fact, an enlarged lymph node in Jones's chest area, R. 91, Def.'s Resp. to Pl.'s Stmt. of Add'l Facts (DSAF) ¶ 6, and indicated that Jones's cancer had progressed. DSOF ¶ 24. The results were forwarded to Cullinan in early July 2007, who then referred Jones to Dr. Paul Fishkin of the Canton Oncology Clinic for further care. *Id.* Fishkin recommended additional testing after seeing Jones on only one occasion, on July 25, 2007. DSOF ¶¶ 25, 28, 29. A couple of biopsies were performed on Jones in August 2007, which confirmed that his lymphoma had recurred. *See* R. 83-4, Peace Dep. 40:7-41:5.

Jones was transferred to Stateville Correctional Center in September 2007, where he was treated by Dr. David Peace at the University of Illinois at Chicago. DSOF ¶¶ 28, 30, 33. Peace decided to administer a salvage chemotherapy treatment called ICE-R beginning on October 1, 2007 and recommended a follow up in two weeks. *Id.* ¶ 37. But Jones did not return to see Peace until one or two weeks after his originally scheduled treatment. *Id.* ¶ 38. Although Peace testified that this delay would

4

not have had any adverse effect on Mr. Jones's chemotherapy treatment, *id.*, he also noted that Jones presented upon his return with "findings of progressive disease." PSAF ¶ 9. Because of this progression, Peace decided to switch Jones's treatment regimen from ICE-R to HyperCVAD chemotherapy. *Id.* ¶ 10. Jones successfully completed several cycles of HyperCVAD, the last of which ended in January 2008. *Id.* ¶ 11. At that point, Peace recommended maintenance chemotherapy to begin on April 18, 2008. DSOF ¶ 40. But Jones was unable to begin his maintenance therapy sessions until a month later, on May 16, 2008. *Id.* ¶ 41. His therapy session was delayed yet again in December 2008 and did not take place until January 9, 2009. *Id.* ¶ 42. Peace did not know whether either of these latter delays had any effect on Jones's recovery or treatment. *Id.* ¶¶ 41, 42.

Jones contends that these scheduling delays resulted were caused by Dr. Parthasaranthi Ghosh, who was the medical director at Stateville. DSOF ¶ 3; *see also* Pl.'s Resp. Br. at 13. But Ghosh testified that he had no involvement with scheduling inmates' visits to outside clinics, and only wrote consults to the outside clinics with the expected appointment dates. DSOF ¶ 31. The actual appointment dates would then be set by the outside clinic. *Id.*

Although Jones has since been released from IDOC custody, he continues to suffer from mantle-cell lymphoma to this day. Pl.'s Resp. Br. at 5.

## II. Legal Standard

Summary judgment must be granted when "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

5

matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citations omitted), and must consider only competent evidence of a type otherwise admissible at trial. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted). The party seeking summary judgment has the initial burden of showing there is no genuine dispute and they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Jones asserts that both Dr. Cullinan and Dr. Ghosh violated his constitutional right to be free from cruel and unusual punishment. The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the government to provide adequate medical care to those being punished by incarceration. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (internal citation and quotation marks omitted). The Amendment safeguards prisoners "against a lack of

6

medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)) Thus, "deliberate indifference to serious medical needs" of a prisoner constitutes unnecessary and wanton infliction of pain and is forbidden by the Constitution. *Estelle*, 429 U.S. at 104 (internal citation and quotation marks omitted).

A deliberate indifference claim has two parts: an objective component and a subjective component, both of which the inmate must prove in order to prevail. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). First, on the objective element, the inmate must demonstrate that the claimed deprivation was "sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Id.* (internal citation and quotation marks omitted). Where, as here, a prisoner asserts he received inadequate medical care, "this objective element is satisfied when an inmate demonstrates that his medical need itself was sufficiently serious." *Id.* (citation omitted). A medical need is "sufficiently serious" when the prisoner's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* (alteration in original) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quotation marks omitted)). Here, the parties do not dispute that Jones suffered from an objectively serious medical condition. Non-Hodgkin's lymphoma is an incurable form of cancer. And lest there be any doubt, the fact that Jones was transferred to Illinois River Correctional Center as soon as the cancer was diagnosed so as to better facilitate his treatment is indicative of the seriousness of his disease.

As for the subjective component, the inmate must establish that the prison official was deliberately indifferent to his medical needs. *Arnett v. Webster*, 658 F.3d 742, 750-51 (7th Cir. 2011). To show that a prison official acted with deliberate indifference, a prisoner must show that (1) the official had actual knowledge of the serious medical need (or at least knew of a substantial risk of harm to the prisoner); and (2) the official's response amounts to reckless disregard for the known serious medical need. *See id.* at 751 (citation omitted). But mere negligence in the provision of medical care is not enough; rather, the official must consciously disregard a known serious medical need. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) (citation omitted).

Applying this to prison medical professionals, prison doctors may exhibit deliberate indifference to a known condition through inaction, *see Gayton v. McCoy*, 593 F.3d 610, 623-24 (7th Cir. 2010), or by persisting with inappropriate treatment, *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011); *Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005). Physicians might also be liable for deliberate indifference by delaying necessary treatment and thus aggravating the injury or needlessly prolonging an inmate's pain. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citations omitted); *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012) (citations omitted). Indeed, "[p]rison doctors cannot simply ignore serious medical conditions or an inmate's severe pain." *Gaston v. Ghosh*, 2012 WL 6632088, at *3 (7th Cir. Dec. 20, 2012). But "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under

8

those circumstances." *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (internal quotation marks and citation omitted). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such judgment." *Id.* at 895 (internal quotation marks and citation omitted). Thus, the burden is high on a plaintiff making a deliberate indifference claim: "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008) (citation omitted).

## A. Dr. Cullinan

### 1. State Action

As a threshold matter, Dr. Cullinan argues that he is entitled to summary judgment because he was not acting under color of state law. To state a claim under 42 U.S.C. § 1983, as Jones does here, a plaintiff must allege that a person acting under color of state law, that is, a state actor, deprived him of a right, privilege, or immunity secured by the Constitution or federal law. *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745-46 (7th Cir. 2010) (citation omitted). In *West v. Atkins*, 487 U.S. 42 (1988), the Supreme Court held that when a private physician contracts with the state to provide medical services to inmates at a state prison hospital on a part-time basis, he acts under color of state law when treating inmates for purposes of § 1983. *Id.* at 54. Although the Supreme Court has yet to decide whether medical care provided to a

9

prisoner in a *private* facility outside of the prison walls constitutes state action, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 672 (7th Cir. 2012), we may look to *West* and the Seventh Circuit's opinion in *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816 (7th Cir. 2009), for guidance in this matter.

*West* teaches that "[i]t is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State." *West*, 487 U.S. at 55-56. "Whether a physician is on the state payroll or is paid by contract, the dispositive issue concerns the relationship among the State, the physician, and the prisoner." *Id.* at 56. One of the factors that a court must weigh in assessing this relationship is the setting in which the medical care is rendered, because "nonmedical functions of prison life inevitably influence the nature, timing, and form of medical care provided to inmates." *Id.* at 56 n.15. A court must also consider (1) the degree of state control over the health care provider's decisions; (2) the voluntariness of the health care provider's relationship with the State; and (3) the relationship of the private medical provider to the prisoner when determining whether a private physician providing health care to state inmates acts under color of state law. *See Rodriguez*, 577 F.3d at 827-828.

A balancing of these factors leads to the conclusion that a genuine issue of material facts exists as to whether Cullinan acted under color of law. First, there is no dispute that Cullinan treated Jones at the Oncology Hematology Associates' facility in Pekin, Illinois. DSOF ¶ 2, PSOF ¶ 2. Although the setting of Jones's care certainly weighs in favor of finding that Cullinan's decisions were not controlled or influenced

10

by the State, the Seventh Circuit has also cautioned that setting alone is not dispositive of state action. Indeed, it is not the case that "all medical advice rendered outside of the prison walls is exempt from the state action doctrine simply because it is provided outside the prison." *Rodriguez*, 577 F.3d at 826. The State can still exert significant control over the private provider beyond the prison walls such that the physician's actions are "fairly attributable to the [S]tate." *Id.* at 827 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)) (internal quotation marks omitted). Here, Cullinan's treatment of Jones was arranged by the State, and Jones's appointments were scheduled at the discretion of the IDOC and based on IDOC's security and scheduling needs. *See* Cullinan Dep. 30:19-30:21, 34:18-35:13. Jones was always accompanied to these appointments by two IDOC officers, and instructions for his follow-up care were transmitted through these officers. *Id.* 72:8-72:20; R. 83-9, Ghosh Dep. 60:7-61:14. Moreover, all decisions regarding further testing and whether Cullinan's recommendations would be followed were left to the State's ultimate discretion. *See* Cullinan Dep. 71:4-72:7. These facts alone are sufficient to raise a genuine issue of material fact as to whether Cullinan's treatment of Jones constituted state action.

But there is support for finding state action in the other factors as well. Whether a private physician voluntarily assumed the state's responsibility for providing healthcare to incarcerated persons is also relevant to the state action inquiry. *Rodriguez*, 577 F.3d at 827. A contractual relationship between the private provider and the State is an important factor in determining whether the health care provider

11

assumed his responsibilities voluntarily, *id.*, though this is certainly not the focus of the inquiry. *See West*, 487 U.S. at 55. Here, Cullinan asserts that he treated Jones as a patient of Oncology Hematology Associates, which is a private medical practice that does not have a contract with IDOC to his knowledge. Cullinan Dep. 30:13-30:18; 111:12-111:15. But Jones asserts that Cullinan "wore two hats," and also served as a regional medical director at Health Professionals Limited (HPL), a health care services contractor to the IDOC. Pl.'s Resp. Br. at 8, PSOF ¶ 2. Because it is not clear whether Cullinan treated Jones in his capacity as a regional director of HPL or as an employee of Oncology Hematology Associates,[3] or whether Oncology Hematology Associates had a contract with the IDOC, a reasonable jury could infer that Cullinan assumed his responsibilities voluntarily.

Finally, in order to be held liable as a state actor, a private provider must have a direct, not an attenuated, relationship with the prisoner-patient. *Rodriguez*, 577 F.3d at 828. If a provider merely assists the State in the provision of health care to prisoners, then it is more difficult to characterize his actions as the assumption of a traditionally state function. *Id.* Here, Cullinan directly treated Jones for lymphoma, and was not merely assisting another state doctor. It is true that Cullinan served as a consulting physician and could only recommend follow-up tests to Dr. Osafo, *see* Cullinan Dep. 71:4-72:7, but there is no doubt that he was the primary architect behind Jones's treatment plan, and indeed Cullinan directly and personally examined Jones

---

[3]Cullinan did testify in his deposition that Jones was not treated as an HPL patient, Cullinan Dep. 30:13-18, but also could not testify affirmatively that Oncology Hematology Associates had no contract with the IDOC.

to formulate that treatment plan. Therefore, this final factor also militates in support of a finding that Cullinan was acting under color of law.

Drawing all reasonable inferences in favor of the non-moving party, the Court concludes that a jury could balance the *Rodriguez* factors and reasonably find that Cullinan acted as a state actor. Accordingly, the state-actor argument does not justify summary judgment in Cullinan's favor.

### 2. Deliberate indifference

Turning now to Jones's substantive claim, Jones asserts that Cullinan acted with deliberate indifference by (1) choosing to administer R-CHOP therapy; (2) failing to request a biopsy of the possible enlarged lymph node in the left armpit area, which was revealed in the February 2006 x-rays; and (3) failing to order a prompt CT scan after discovering a possible enlarged lymph node in his chest in March 2007. Pl.'s Resp. Br. at 10-12. The Court will address each of these allegations in turn.

### a. R-CHOP Therapy

Jones contends that Cullinan acted with deliberate indifference in choosing R-CHOP therapy to treat his non-Hodgkins lymphoma, but that basis for liability cannot withstand summary judgment, because a jury can infer deliberate indifference on the basis of a physician's treatment decision only when the decision is "so far afield from the accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Here, both Dr. Fishkin and Dr. Peace testified that R-CHOP therapy is an acceptable method of treating non-Hodgkins lymphoma, even if it is not the approach they would

13

have chosen. *See* R. 83-5, Fishkin Dep. 53:9-53:18; Peace Dep. 31:10-31:12, 75:15-75:19. Indeed, R-CHOP was listed as an acceptable treatment option during the relevant time period under the National Comprehensive Cancer Networks' guidelines, which are a set of consensus-based guidelines written by physicians in the field. Fishkin Dep. 53:9-54:14. Thus, it cannot be said that Cullinan's decision to use R-CHOP therapy was one that "no minimally competent professional would have [chosen] under those circumstances," *Roe*, 631 F.3d at 857 (internal quotation mark and citation omitted). Accordingly, summary judgment is granted with respect to the R-CHOP therapy issue.

### b. Failure to Request a Biopsy

Jones next claims that Cullinan acted with deliberate indifference when Cullinan failed to effectively communicate his request to have Osafo perform a biopsy on the possible enlarged lymph node in Jones's left armpit area. It is true that rather than directly instructing Osafo to perform a biopsy the possible residual adenopathy, Cullinan only wrote that he "wonder[ed] if [the area] is biopsiable." DSOF ¶ 19; Pl.'s Exh. 4. It is also true that Osafo interpreted this statement only as Cullinan's wondering to himself whether a biopsy would be possible, and therefore Osafo never ordered a biopsy. PSAF ¶¶ 1, 2. But a clumsily-worded request does not amount to deliberate indifference, especially because neither party contests that Cullinan did intend the statement to be a request that Osafo perform a biopsy. Cullinan Dep. 85:7-85:11, 88:8-88:14. Thus, it cannot be said that Cullinan *subjectively* intended to ignore Jones's serious medical needs. Cullinan's failure to clearly communicate the biopsy request was perhaps negligent, but deliberate indifference "is more than negligence."

14

*Collignon*, 163 F.3d at 988 (citation omitted). And because Cullinan's intent here is not in serious dispute, no reasonable jury could base a deliberate-indifference finding on the miscommunication.

To the extent that Jones is arguing that his relapse would have been caught and treated earlier but-for Cullinan's failure to request the biopsy, that argument cannot stand either. A delay in providing medical treatment "may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (citations omitted). Jones does not argue that he suffered prolonged pain as a result of any alleged delay in catching the relapse, so his claim can only survive if he can show that the delay exacerbated his condition in some way. But Jones has presented no evidence that his prognosis would have improved if the relapse had been caught sooner, or that a possible enlarged lymph node is concrete evidence of relapse. The record shows that even after Cullinan's initial discovery of the possible enlarged lymph node in February 2006, there were no significant problems found in his subsequent lab tests in July 2006. *See* DSOF ¶¶ 20-21. Thus, a jury could not reasonably infer that Cullinan could have caught Jones's relapse earlier if he had requested a biopsy in February 2006—indeed, Jones could not have been suffering from a relapse in February if his test results were still showing a clean bill of health in July. Accordingly, summary judgment is granted as to Jones's contention that Cullinan violated his Eighth Amendment right by failing to request a biopsy in February 2006.

15

**c. Delay in Requesting a CT Scan**

Jones's last argument—that Cullinan's decision not to request an immediate CT scan upon discovering an enlarged lymph node in Jones's chest in March 2007 constitutes deliberate indifference—presents a closer call. Here, Jones is essentially claiming that had Cullinan requested a CT scan earlier, Jones's relapse would have been treated earlier. As discussed above, a delay in providing medical treatment can be the basis of a deliberate-indifference claim if the delay exacerbated the patient's medical condition. *McGowan*, 612 F.3d at 640. The plaintiff must place "verifying medical evidence" in the record to establish the detrimental effect of a delay in medical treatment. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (emphasis and citations omitted). But a plaintiff need not present direct evidence that he suffered some harm because of the alleged delay; circumstantial evidence of harm is enough. *See id.* at 779 (finding that evidence that a pretrial detainee suffered nasal fracture, could experience bleeding, and later underwent painful nose surgery qualified as verifying medical evidence supporting a genuine issue of material fact as to the jail officers' deliberate indifference.).

Here, Jones has presented sufficient verifying medical evidence of harm to put before a jury the issue of Cullinan's deliberate indifference. Cullinan noticed a questionable enlarged lymph node in Jones's chest while reviewing an x-ray study in March 2007. DSOF ¶ 22. The radiologist who performed the x-ray had suggested that the area might warrant further studies, such as a CT scan. Osafo Dep. 136:14-137:7; R. 89-7, Pl.'s Exh. 6. Moreover, it is generally accepted in the medical community that

non-Hodgkin's lymphoma is an incurable form of cancer that has an "indolent behavior but a relentless recurrent nature . . . that is a challenge for clinical treatment." Peace Dep. 16:16-16:22. But rather than request a CT scan immediately, Cullinan recommended that the studies be repeated in three months. DSOF ¶ 22. Although it is standard protocol for a lymphoma patient to undergo follow-up testing every three to six months, and there is no defined standard for what is included in this clinical evaluation, Fishkin Dep. 73:4-73:18, a jury could also reasonably infer that Cullinan deliberately disregarded a known risk of recurrence.

This is further corroborated by the events leading up to Jones's relapse. Per Cullinan's instructions, Osafo ordered another set of x-rays in June 2007. Osafo Dep. at 141:5-141:10. When the results came in, Dr. Shute, a visiting doctor who was filling in for Osafo, noticed a problem and immediately recommended a new CT scan. *Id.* 142:3-142:13. This scan revealed that there was in fact a lymph node enlargement in Jones's chest. *Id.* 143:14-144:14. On July 9, 2007, these studies were forwarded to Cullinan, who then referred Jones to Dr. Fishkin at the Canton Oncology Clinic for further care. DSOF ¶ 24. Fishkin saw Jones only one time, on July 25, 2007, *id.* ¶ 25, but by August 2007, subsequent biopsies had confirmed that Jones's cancer had returned. Peace Dep. 40:7-41:5. Jones was then transferred to Stateville in September 2007 so that he could see Dr. Peace at the University of Illinois at Chicago. DSOF ¶¶ 28, 30, 33. Jones began salvage chemotherapy under Peace's care in early October 2007. *Id.* ¶ 37. The fact that Fishkin saw Jones promptly after the adenopathy was confirmed by the CT scan, and the fact that Jones started salvage chemotherapy

17

shortly after the confirmation of cancer relapse, serve as circumstantial evidence of harm caused by Cullinan's alleged delay. Accordingly, Jones has presented sufficient verifying medical evidence of harm to raise a genuine issue of material fact, and summary judgment is denied as to this one possible basis of the deliberate-indifference claim.

**B. Dr. Ghosh**

Jones separately alleges that Dr. Ghosh's failure to arrange adequate follow-up appointments while he was being held at Stateville constitutes deliberate indifference. Ghosh contends that even if there were delays in the scheduling of Jones's follow-up appointments, summary judgment is warranted because Ghosh was not responsible for scheduling follow-up visits. DSOF ¶ 31. The Court agrees. Ghosh testified that he had no input in scheduling Jones's visits to see Dr. Peace, and that he (Ghosh) was only responsible for writing consults to the outside clinics. Ghosh Dep. 59:15-60:16. The actual dates of the appointments were set by the clinics themselves. *Id.* Moreover, to the extent that anyone at Stateville was involved in scheduling appointments with outside clinics, those responsibilities were handled by the medical records director at Stateville. *Id.* 57:7-57:18. Jones has presented no factual evidence to counter Ghosh's testimony, and instead makes a bald assertion that Ghosh must have been involved in the scheduling process because he insisted that any scheduling issues had to have been caused by Peace's office. Pl.'s Resp. Br. at 13; PSOF ¶ 31. Without any contradicting factual evidence, direct or circumstantial, that Ghosh actually was involved in scheduling Jones's appointments, Jones has failed to present any issue of material fact

18

that Ghosh was responsible for the alleged scheduling delays. Accordingly, summary judgment is granted as to the deliberate indifference claim against Ghosh.

## IV. Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted in part and denied in part. Ghosh is now out of the case, but there remains a triable issue of fact as to whether Cullinan acted with deliberate indifference in forgoing a CT scan after discovering a possible enlarged lymph node in March 2007. At the next status hearing, counsel for Plaintiff and counsel for Cullinan should be prepared to discuss whether reconvening a settlement conference would be productive in light of this decision on the summary judgment motion.


ENTERED:


    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: March 31, 2013